UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

SHANNON VEGA

   Plaintiff,

v.

THE MARIETTA DINER, INC. and
MARIETTA FISH MARKET, LLC

   DefendantS.
_____

CIVIL ACTION FILE NO.
_____

## COMPLAINT

Plaintiff Shannon Vega ("Plaintiff" or "Vega") files her Complaint against Defendants The Marietta Diner, Inc. ("Marietta Diner") and Marietta Fish Market, LLC (the "Fish Market") (collectively "Defendants").

## NATURE OF THE ACTION

1.

This is an action for discrimination, failure to accommodate, and retaliations under the Americans with Disabilities Act of 1990, as amended, 42 U.S. §§ 12101 *et seq*. (ADA).

## PARTIES

2.

Plaintiff Shannon Vega is a U.S. citizen and resident of Cobb County in the State of Georgia.

3.

Defendant The Marietta Diner, Inc. is a corporation organized under the laws of Georgia with its principal address at 306 Cobb Parkway, Marietta, Georgia, 30060. The Marietta Diner, Inc. is subject to an action under the ADA, and can be serve with summons and complaint upon its Registered Agent and CEO: Constantine Tselios at the same address.

4.

Marietta Fish Market, LLC is a limited liability corporation organized under the laws of Georgia and operates a restaurant at its address at 3185 Canton Road, Marietta, Georgia, 30066 in Cobb County. Marietta Fish Market, LLC is subject to an action under the ADA, and can be serve with summons and complaint upon its Registered Agent: Constantine Tselios, at 3205 Canton Road, Suite 101, Marietta, Georgia, 30066.

## JURISDICTION AND VENUE

5.

The claims brought in this lawsuit present federal questions and jurisdiction in this court is proper under 28 U.S.C. §§'s 1331, 1337, 1343, and 1367.

6.

Venue of this suit is proper in the Northern District of Georgia, Gainesville Division under 28 U.S.C. § 1391. Defendant principal office address is in this division, so it resides within this division. The alleged unlawful acts against Plaintiff also occurred in this judicial district and division. In addition, Defendant operates in this judicial district and division.

7.

Plaintiff filed a charge against Marietta Family Restaurants (which is a fictitious entity name identified as the employer in the employee handbook she was issued), with the Equal Employment Opportunity Commission on September 2, 2020. An attorney representing both Defendants filed a position statement in response. The EEOC mailed Plaintiff a Notice of Right to Sue on or about March 5, 2021.

## FACTUAL ALLEGATIONS

8.

Cherokee Steakhouse, Inc. (d/b/a Cherokee Cattle Company) employed Vega part-time as a server at its restaurant on or around the beginning of March, 2020.

9.

Around March 25, 2020, that location temporarily closed due to COVID-19.

10.

Defendant The Marietta Diner, Inc. hired Vega as a server and assigned her full-time hours.

11.

During her entire time working for both Defendants, Vega was never counseled on any performance issue, but instead was praised for her performance by her supervisor, co-employees, and customers.

12.

A dinner shift at the Marietta Diner lasts from 5:00 PM to 5:00 AM.

13.

During that time, most server employees are not afforded any breaks lasting ten to fifteen minutes or meal breaks.

14.

For various reasons, some servers were allowed breaks, including meal breaks.

15.

Because she had a doctor's appointment in late June 2020 that might cause her to be late for her shift, she sought permission from her manager, Kevin Maude, to attend this appointment. Kevin Maude granted this permission and told Vega he would have someone else cover her shift until she arrived.

16.

At her appointment, Vega's doctor had informed her of her diagnosis of Ehlers Danlos Syndrome and Polycythemia Vera Leukemia. These conditions that substantially impair her stamina in walking or standing and her circulatory, skeletal, and lymphatic systems.

17.

When Vega arrived for her shift about thirty minutes late, Kevin Maude berated her in the dining room in front of customers for being tardy.

18.

In response, Vega broke down in tears.

19.

Kevin Maude asked her what was wrong, and she informed him of her diagnosis.

20.

In early July 2020, Vega asked Kevin Maude for an accommodation for her disabilities by providing him with a doctor's note requesting that she be able to occasionally take ten to fifteen-minute breaks from standing.

21.

In response, Kevin Maude told Vega that she could not have any breaks to sit down, but could take "smoke breaks" for "a minute or two."

22.

Even when Vega took these breaks. however, Kevin Maude would urge her to hurry up and get back inside.

23.

At some point, Vega also told Kevin Maude that she had needed to attend three physical therapy sessions a week and that she would schedule them not to interfere with her scheduled shifts.

24.

But on a few occasions, Kevin Maude would still place Vega on the work schedule when she had physical therapy appointments. Vega could not cancel the appointments without paying a fee.

25.

Kevin Maude would not take Vega off of the schedule on these days (despite her asking not to work those days). Instead, he informed her that he would have someone cover for her until she arrived.

26.

A couple of times a week, Vega's managers sent her home early when business was slow due to the onset of the COVID-19 pandemic.

27.

On July 23, 2020, Vega became sick with COVID-19 like symptoms.

28.

John LNU, a Marietta Diner manager, informed her she needed to obtain a COVID-19 test and Kevin Maude told her she could not return to work until she tested negative for COVID-19.

29.

On July 27, 2020, Vega returned to work with both a negative COVID-19 test and a doctor's note stating asking that she be excused for missing her shift the day before.

30.

In a meeting with Kevin Maude, Vega discovered that he had taken her off the schedule and that she would not be returning to work that day.

31.

Kevin Maude then told her that owner Gus Tselios told him that he "did not want people working [at Marietta Diner] who had medical conditions."

32.

When Vega proffered her tie and apron to Kevin Maude in response, he told her that he would speak to Tselios to see if he would change his mind since Vega was a good server and had started to build a customer base.

33.

That same day, another employee, Breanna LNU who had no disabilities and had also just returned to work after becoming sick with COVID-19 like symptoms, was assigned to work the drive thru.

34.

Vega complained to Kevin Maude about her not also being assigned any work.

35.

Kevin Maude told Vega he would call her after he talked with Tselios.

36.

Vega went to what she considered Defendant's Headquarters on Canton Highway to talk with Tselios herself, but was told he was out of town on vacation.

37.

Instead, Vega talked to Mandy Anderson in Human Resources, who told her that Tselios's remark was "illegal" and that she "would contact him."

38.

On July 29, 2020, Vega went to eat dinner at the Marietta Diner.

39.

At that time, Tselios's father, saw her eating and asked why he had not seen her at work. Tselio's father acts as sort of a permanent host at the Marietta Diner.

40.

She told Tselios's father that she had not been allowed to return to work because of her medical conditions. He came back to her fifteen minutes later and told her that she could work at the Marietta Fish Market.

41.

Vega replied that she had heard that the tip opportunities at the Fish Market were not as good as those at Marietta Diner and that she would lose the customer base she had begun to build at Marietta Diner if she were transferred to the Fish Market.

42.

When Vega reported to work at the Fish Market, the manager, Liz LNU, told her that she could not begin working there until she received approval from Tselios.

43.

On July 31, 2020, Vega was told she would have to wait for Tselios to return from out of town until she could receive approval to be employed at the Fish Market.

44.

On August 4, 2020, Anderson informed Vega that she could report to work at the Fish Market.

45.

Anderson confirmed that the tip potential at the Fish Market was much lower than that at the Marietta Diner. She told Vega that she had worked at both restaurants.

46.

Additionally, instead of scheduling her for the five shifts she had worked at Marietta Diner, Defendant only scheduled Vega for one to two shifts at the Fish Market.

47.

Vega continued to ask many managers and Anderson why she was moved to the Fish Market. The only answer she received is that Tselios and his father thought it would be easier on her.

48.

Vega continued to complain to Anderson about being moved to the Fish Market.

49.

While working at the Fish Market, Vega was still denied the accommodations regarding being allowed to occasionally sit for ten- to fifteen-minute breaks that she had asked for.

50.

In fact, Vega was not even allowed to take the "smoke breaks" that were allowed at Marietta Diner. During her shifts at the Fish Market, she was almost never allowed a break.

51.

Vega only asked to take breaks when the Fish Market was not busy.

52.

Even so, when Vega asked to take a break, Liz LNU and other managers would retaliate against her.

53.

For example, after Vega took a five-minute break on August 13, 2020, Liz LNU did not seat any patrons in her section for at least forty-five minutes after she returned to the floor.

54.

After noticing Liz LNU's treatment of Vega, another server told her that what management was doing was wrong and offered Vega one of her tables.

55.

Vega declined this offer because she was afraid of further retaliation against herself or this server.

56.

Instead, Vega asked Liz LNU if she could begin closing duties and complained that it was wrong to retaliate against her for seeking a break for her medical conditions.

57.

In response, Liz LNU yelled that if Vega could not stand up for forty-five minutes while being paid the tip credit wage of $2.13 an hour, she would have to "cut her time."

58.

On August 7, 2020, due to not being allowed a sitting break, Vega injured her knee while working, which further weakening her ability to stand for long periods of time.

59.

Because of her disabilities, Vega's injuries took longer to heal than a non-disabled person.

60.

Even with this additional injury, which was a disability in itself because it substantially impaired her in the major life activities of standing, walking, lifting, and bending, her supervisors would not allow her to take the requested sitting breaks as an accommodation.

61.

The period where Defendant discriminated and retaliated against Plaintiff caused her financial hardship and emotional distress.

62.

Eventually, Plaintiff had to have operations on her injury and other medical conditions and was granted leave.

63.

When she asked to return to work, she was assigned to the Fish Market even though she asked to return to the Marietta Diner.

64.

After a couple of shifts, Vega knew that she could no longer physically perform serving duties due to her injuries and surgeries.

**COUNT ONE**
**DISCRIMINATION UNDER THE ADA**

65.

Plaintiff's multiple medical conditions, including those caused by her work injury, were physical impairments that substantially limited her in the major life activities of walking, standing, lifting, bending, and working.

66.

Her medical conditions also limited her neurological, brain, and circulatory, skeletal, and lymphatic bodily functions.

67.

Vega informed her supervisors of her disabilities and how they affected her. She also sought reasonable accommodations for her disability.

68.

Both Defendants were aware that Plaintiff had a record of a disability.

69.

Both Defendants also regarded Plaintiff as disabled.

70.

When Defendant's owner Tselios discovered Vega had a disability, he told her manager that "he did not want people working who have medical conditions."

71.

In response, Defendant Marietta Diner did not schedule Plaintiff for any shifts because of her disability.

72.

Instead, the owner's father advocated that Plaintiff be allowed to work at the Fish Market.

73.

But even this was delayed until the owner approved her hire there. During the time she attempted to return to the Marietta Diner until she was allowed to work at the Fish Market, Plaintiff was unable to earn any wages or tips.

74.

Plaintiff's earnings at the Fish Market were less than she made at the Marietta Diner because there were less tips and she was scheduled for fewer and shorter shifts.

75.

Defendant Marietta Diner violated the ADA by not allowing her to return to work and moving her to a restaurant with less earning potential.

76.

Defendant Marietta Fish Market violated the ADA by not assigning Plaintiff to full-time shifts.

77.

As a result of Defendant's discriminatory acts, Plaintiff is entitled to recover the relief requested below.

## COUNT TWO
## FAILURE TO ACCOMMODATE UNDER THE ADA

78.

Defendants violated the ADA by failing to grant Plaintiff a reasonable accommodation of allowing her occasional short breaks to sit and rest her legs during long shifts. Defendants also violated the ADA by assigning her to work long shifts right after she attended physical therapy.

79.

Defendants cannot show that it would have been an undue burden to allow Plaintiff to take occasional short sitting breaks during her shifts.

80.

A one- to two-minute standing smoke break is not a reasonable accommodation under the ADA.

81.

As a result of Defendants' failure to accommodate, Plaintiff is entitled to recover the relief requested below.

## COUNT THREE
## RETALIATION UNDER THE ADA

82.

Plaintiff engaged in protected activity under the ADA when she sought accommodations by requesting occasional short sitting breaks and to schedule her shifts around her physical therapy appointments.

83.

Rather than grant these accommodations, Defendant Marietta Diner retaliated by not allowing Plaintiff to return to work there after she attempted to return to work after receiving a negative COVID-19 test.

84.

Plaintiff engaged in the protected activity of reporting the owner's discriminatory statement about not allowing employees with medical conditions to work at the Marietta Diner to Human Resources and the owner's father.

85.

Defendants further retaliated against Plaintiff by moving her to the Fish Market and assigning her less shifts with fewer hours.

86.

Defendant Marietta Fish Market further retaliated against Plaintiff by not assigning customers to her stations after she returned from the few sitting breaks she was ever allowed.

87.

As a result of Defendants' retaliatory acts, Plaintiff is entitled to recover the relief requested below.

WHEREFORE, Plaintiff prays:

a. That Summons issue requiring Defendants to answer the Complaint within the time provided by law;

b. That Plaintiff be awarded a declaratory judgment that Defendants violated the ADA;

c. That Plaintiff recover from Defendants back pay with pre-judgment interest;

d. That Plaintiff recover compensatory damages against Defendants in an amount to be determined by a jury;

e. That Plaintiff recover punitive damages against Defendants in an amount to be determined by a jury;

f.      That Plaintiff recover attorney's fees and costs of litigation under the ADA and other applicable federal law;

g.      That the Court award Plaintiff any other or further relief as it deems necessary and proper, or equitable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Respectfully submitted this 2nd day of June, 2021.

        T. Robert Reid, LLC

        <u>s/ Tilden Robert Reid, II</u>
        T. Robert Reid
        Ga. Bar No. 600138

        1030 Woodstock Road
        Suite 3112
        Roswell, Georgia  30075
        Telephone (678) 743-1064
        Facsimile (404) 549-4136
        robreidattorney@gmail.com

         Attorney for Plaintiff